**TOYOMENKA PACIFIC PETROLEUM, INC., Plaintiff,**

v.

**HESS OIL VIRGIN ISLANDS CORP., Defendant.**

**No. 90 Civ. 3720 (MGC).**

United States District Court, S.D. New York.

July 23, 1991.

As amended July 24, 1991.

Burlingham Underwood & Lord by Michael Marks Cohen, John G. Ingram, New York City, for plaintiff.

Hill, Betts & Nash by John F. Keating, New York City, for defendant.

## AMENDED OPINION AND ORDER

CEDARBAUM, District Judge.

Plaintiff Toyomenka Pacific Petroleum, Inc. ("Toyomenka") is a California corporation. Defendant Hess Oil Virgin Islands Corp. ("Hess") is a U.S. Virgin Islands corporation. Toyomenka brings this diversity action to recover demurrage for Hess's delay in taking delivery of a cargo under a contract for the sale of crude oil. Both parties have moved for summary judgment. Because the material facts are not in dispute and I conclude that Hess's delay is excused by the force majeure clause of the contract, Hess's motion for summary judgment is granted and Toyomenka's motion is denied.

## FACTS

The following facts are undisputed except where noted.

Hess owns an oil refinery on St. Croix with a terminal for receiving crude oil. On September 11, 1989, Toyomenka contracted to sell crude oil to Hess and to deliver the oil by ship to Hess's St. Croix terminal between October 25 and November 7, 1989. (Contract, Cl. EEE.) [1] Toyomenka provided the wording of the Contract. (Toyomenka Rule 3(g) Counterstatement, ¶ 2.)

The Contract provided that Hess would pay demurrage for the ship's laytime at the terminal. (Contract, Cl. JJJ, KKK.) The Contract fixed the rate of demurrage "as per charter party demurrage rate." (Contract, Cl. KKK.) On September 15, 1989, Toyomenka chartered the Edenburgh Fruid ("Fruid") to deliver the oil to Hess under a charter party which set daily demurrage at $17,500. (Toyomenka Ex. 2, Part I, Clause I.)

The Contract also included a force majeure clause, Clause QQQ, which reads as follows:

Neither seller nor buyer shall be liable for damages or otherwise for any failure or delay in performance of any obligation hereunder other than the obligation to make payment, where such failure or delay is caused by force majeure, being any event, occurrence or circumstance reasonably beyond the control of the party claiming force majeure, including without prejudice to the generality of the foregoing, failure or delay caused by or resulting from acts of God, strikes, labor disputes, fires, floods, wars (whether declared or undeclared), riots, destruction of the product, delays of carriers due to breakdown or adverse weather, perils of the seas, embargoes, accidents, restrictions imposed by any governmental authority (including allocations, priorities, requisitions, quotas and price controls). The party claiming force majeure shall give written notice thereof to the other party within forty-eight (48) hours of the occurrence thereof, stating in reasonable detail the cause and the expected duration. The affected party shall use reasonable diligence to remove the force majeure situation as quickly as possible.... The time of the seller to make or buyer to receive delivery hereunder shall be extended during any period in which delivery shall be delayed or prevented by reason of any of the foregoing causes, up to a total of thirty (30) days. If any delivery hereunder shall be so delayed or prevented for more than thirty (30) days, either party may terminate this contract with respect to such deliv-

---

1. The contract of sale ("Contract") is Exhibit 1 to Toyomenka's Notice of Motion for Summary Judgment.

ery upon written notice to the other party.

(Contract, Cl. QQQ.)

On September 17 and 18, 1989, Hurricane Hugo passed over St. Croix, causing damage to Hess's terminal and refinery. Toyomenka does not dispute that its personnel "were in nearly daily contact with [Hess] following the hurricane, were apprised of this circumstance," and that "information regarding the condition of the refinery was communicated to them as such became available." (Hess Rule 3(g) Statement, ¶ 14.)

On September 26, 1989, Hess telexed a notice to Toyomenka which read:

As you know, as a consequence of Hurricane Hugo which devastated St. Croix, USVI, our facility there suffered substantial damage and is completely inoperative.

Following our survey of the facility, it has been determined that we are unable to receive or process captioned cargo, and we are presently unable to advise as to the duration and consequence of this force majeure event. We shall advise you when we are in a position to do so.

Regrettably, under the circumstances of this force majeure event, and in accordance with Clause QQQ of captioned contract, please accept this as our notice of such force majeure.

(Toyomenka Ex. 3A.)

Two days later, on September 28, Hess again telexed Toyomenka, this time stating that it appeared that the harbor's ship channel would be reopened on October 3 and that Hess "can discharge crude oil into our refinery to be held in storage until some future date when the refinery will process same." Hess concluded: "In view of the above, it appears now, and we will make our best efforts to discharge the SS Fruid Edenburg with cargo of duri crude oil on arrival." (Toyomenka Ex. 3B.)

On September 29, Toyomenka telexed Hess acknowledging receipt of both telexes and saying:

. . . . We are pleased that you anticipate being able to meet the contract schedule, however, you will appreciate that in view of the limited information available to us, we must reserve judgement as to whether force majeure excuses any failure to receive delivery when due. In any event we would expect Hess to pay any demurrage that may accrue under the charter party, as provided in our subject sale contract.

We request that you continue to keep us informed of the status of your facility. We trust that Hess will treat all shippers fairly and equitably during this period.

(Toyomenka Ex. 9.)

Hess telexed Toyomenka once more on October 25, 1989, saying: "Chtr advised receivers still intending to berth VSL on arrival for discharge." (Toyomenka Ex. 3C.)

The Fruid arrived at St. Croix and gave notice of readiness on October 28, 1989, but did not berth until November 9. (Norwood Aff., ¶ 11–12.) It completed discharging its cargo on November 13. (Norwood Aff., ¶ 13.)

It is undisputed that the first ship to discharge its cargo at Hess's facilities after the hurricane did so on October 2, 1989. However, it is also undisputed that 6,000,-000 barrels of storage capacity lost as a result of the hurricane were not restored by November 9, 1989 and the refinery was not restored to its full processing capabilities until December 9, 1989. (Hess Rule 3(g) Statement, ¶¶ 11, 12.) Nor does Toyomenka dispute that following the hurricane, Hess "received cargoes as they arrived to the extent that it was able to do so given its considerably diminished storage and refining capacity." (Id., ¶ 23.)

In January, 1990, Toyomenka billed Hess for demurrage of $243,019 for the Fruid's laytime at St. Croix from its notice of readiness on October 28, 1989 through the completion of the cargo discharge on November 13, 1989, less deductions for allowed laytime. (Toyomenka Exs. 5A, 5B, 5C.) Hess responded that it was "not responsible for demurrage on above vessel by reason of force majeure." (Toyomenka Ex. 6.)

Toyomenka then brought this diversity action against Hess seeking $243,019 in demurrage under the Contract. Hess subsequently paid Toyomenka $45,694 in demurrage for laytime after November 9, 1989, when the Fruid was in berth at St. Croix. (Norwood Aff., ¶ 18.) Thus, Toyomenka now seeks only demurrage for laytime from October 28 through November 9, 1989, when the Fruid was waiting to berth, in the amount of $197,325. (Toyomenka Rule 3(g) Statement, ¶ 17.)

## DISCUSSION

The Contract provides that it is to be governed by and construed in accordance with the laws of the state of New York without reference to any conflict of laws rules. (Contract, Cl. OOO.)

Toyomenka argues that full demurrage accrued under its charter from October 28 through November 9, 1989 and the Contract entitles it to demurrage from Hess during this period. Toyomenka also contends that Hess waived the force majeure defense by failing to give timely notice; that Hess is estopped from invoking force majeure by its September 28 notice that it would use its best efforts to take delivery; that the delay was not covered by the force majeure clause; and that even if applicable, the force majeure clause does not excuse liability for demurrage.

Hess argues that the force majeure clause excuses it from liability for demurrage for the disputed period because its delay in taking delivery was caused by a force majeure event, that it did not waive the defense of force majeure and is not estopped from invoking it, and the force majeure clause does excuse liability for demurrage. Hess also argues that it is not liable because demurrage did not accrue under the charter while the Fruid was awaiting berth, or alternatively, that demurrage accrued at only one-half the normal rate.

■ A motion for summary judgment shall be granted if the court "determines that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56. *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988). The test for granting a summary judgment motion parallels the standard for a directed verdict. If the evidence is such that a reasonable finder of fact could return a verdict for the nonmoving party, then there is a genuine factual dispute and summary judgment should not be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *see also Blum v. Koch,* 716 F.Supp. 754, 757 (S.D.N.Y.1989).

### I. *Force Majeure as a Cause of the Delay*

■ The force majeure clause extends for up to thirty days the time of the buyer to take delivery, where such delay is caused by force majeure. In this case, delivery was delayed for twelve days, from October 28 to November 9. Thus, if Hess's delay resulted from a force majeure event, it is excused under the Contract. Toyomenka does not dispute that Hurricane Hugo was a force majeure event. Rather, it argues that the hurricane did not cause Hess's delay.

Toyomenka points out that the first ship to discharge its cargo at Hess's facilities after the hurricane did so on October 2, 1989. From this, Toyomenka argues that the delay was caused not by Hurricane Hugo but by "post-hurricane congestion" and was therefore not excused by force majeure. (Toyomenka Memo. at 12–15.) However, 6,000,000 barrels of storage capacity lost as a result of the hurricane were not restored by November 9, 1989, and the refinery was not restored to its full processing capabilities until December 9, 1989. (Hess Rule 3(g) Statement, ¶¶ 11, 12.) In addition, following the hurricane, Hess "received cargoes as they arrived to the extent that it was able to do so given its considerably diminished storage and refining capacity." (*Id.,* ¶ 23.)

Toyomenka has submitted no evidence to create a dispute on this issue. Toyomenka's Rule 3(g) Counterstatement answers seventeen of the facts asserted by Hess by

reciting that they are "[c]ontroverted for lack of information sufficient to form a belief about the accuracy of these allegations...." Such statements do not create genuine disputes of fact. Federal Rule of Civil Procedure 56 provides:

> when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). Thus, Toyomenka's assertions that Hess's evidence is "controverted" do not set forth facts showing that there is a genuine issue for trial. It is therefore undisputed that through November 9, 1989, Hess's facilities for refining and storage remained damaged and that Hess received cargoes as they arrived to the extent it was able to do so.

Toyomenka also argues that the delay did not result from force majeure but from Hess's contractual arrangements with other suppliers since Hess took delivery of earlier arriving cargoes in the order of their arrival. (Toyomenka Memo. at 13–15; Toyomenka Reply Memo. at 6–7.) Hess's obligation to take delivery from Toyomenka following the hurricane was governed by the provision of Clause QQQ that states: "The affected party shall use reasonable diligence to remove the force majeure situation as quickly as possible." It is undisputed that following the hurricane, Hess "received cargoes as they arrived to the extent that it was able to do so given its considerably diminished storage and refining capacity." (Hess Rule 3(g) Statement, ¶ 23.) By taking delivery of cargoes as they arrived, Hess used reasonable diligence. Toyomenka's argument that Hess was required to accept its cargo upon arrival, regardless of other sellers already waiting, is not persuasive. Such a strained reading of the force majeure clause would undermine the purpose of the clause. Toy-

omenka has not provided either reason or authority for such an interpretation of the contract.

Accordingly, Hess's eleven-day delay in performing its duty to take delivery resulted from a force majeure occurrence and is excused by the force majeure clause of the Contract.

### II. *Waiver of Force Majeure Defense by Late Notice*

Toyomenka argues that Hess waived the defense of force majeure because its notice of force majeure was untimely under Clause QQQ, which states: "The party claiming force majeure shall give written notice thereof to the other party within forty-eight (48) hours of the occurrence thereof stating in reasonable detail the cause and the expected duration." It is undisputed that Hurricane Hugo ended on September 18 and that Hess did not give written notice of force majeure until September 26.

■ Although Clause QQQ requires the party claiming force majeure to give written notice within forty-eight hours, whether such notice is a condition precedent to invoking force majeure is determined by the intention of the parties as expressed in the contract. *See Facilities Dev. Corp. v. Nautilus Constr. Corp.*, 156 A.D.2d 911, 912, 550 N.Y.S.2d 127, 128 (3rd Dept.1989) ("To make a provision in a contract a condition precedent, it must appear from the contract itself that the parties intended to so operate.") (*citing* 22 N.Y.Jur.2d, Contracts, § 234, at 82). Under New York law, a contractual duty will not be construed as a condition precedent absent clear language showing that the parties intended to make it a condition. *F.H.R. Auto Sales, Inc. v. Scutti*, 144 A.D.2d 956, 534 N.Y.S.2d 266 (4th Dept.1988) (tenant's covenant to repair is not condition precedent to landlord's duty where landlord's duty is not expressly conditioned upon plaintiff's performance of the repairs).

■ Clause QQQ does not expressly make a force majeure defense conditional upon giving notice within forty-eight hours.

The purpose of Clause QQQ was to protect both parties against unforeseen occurrences such as Hurricane Hugo, and the clause does not clearly indicate that the parties intended that protection to be forfeited if formal notice were not given within forty-eight hours. The notice requirement is properly construed as a duty to be performed under the contract rather than as a condition precedent to a force majeure defense. *See Security Mut. Cas. Co. v. Century Cas. Co.*, 531 F.2d 974, 976 (10th Cir.), *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976) ("[S]tipulations for notice will not be construed as conditions precedent if reasonably open to another construction.").

■ Because the forty-eight hour notice provision creates a duty to be performed by the party invoking force majeure, and not a condition precedent, only a material breach of this duty can affect the right to invoke force majeure. Hess's delay in giving notice until September 26 was not material for two reasons.

First, Hess made a reasonable effort to notify Toyomenka of force majeure as soon as possible. John Maher, Vice–President of Amerada Hess Trading Company, Hess's parent, affirms that Toyomenka personnel "were in nearly daily contact with [him] following the hurricane" and were apprised that the damage to the refinery and terminal could not be immediately determined, and that "information regarding the condition of the refinery was communicated to them as such information became available." (Maher Aff., ¶¶ 4–5; Hess Rule 3(g) Statement, ¶ 14.) In response, Toyomenka asserts that "defendant gave no oral notice of force majeure during any of these discussions," but does not dispute that Hess gave it actual notice of the hurricane and the damage to Hess's facilities right away, before Hess formally gave notice of force majeure. (Toyomenka Rule 3(g) Counterstatement, ¶ 14.)

Hess's formal notice of force majeure, given on September 26, 1989, immediately followed the completion of its preliminary survey of the damage to its refinery. (Maher Aff., ¶ 6.) This notice, although given six days after the expiration of the forty-eight-hour notice period, was given twenty-nine days before the start of the contractual delivery period on October 25, and more than a month before the Fruid arrived at the terminal.

Second, Toyomenka has alleged no harm or prejudice from Hess's late notice. *See Unigard Security Ins. Co. v. North River Ins. Co.*, 762 F.Supp. 566 (S.D.N.Y.1991) (to assert defense of late notice, the one seeking to escape obligations must show material breach or prejudice from the inadequate notice). Indeed, it is hard to imagine what prejudice Toyomenka could allege. Invoking force majeure simply extends for thirty days a party's time to perform. It does not relieve the other party from its contractual obligations or allow it to terminate the contract. Because there is nothing that Toyomenka could have done differently under the contract if it had received Hess's notice of force majeure within forty-eight hours, the additional six-day delay could not have prejudiced it.

The cases that Toyomenka cites do not establish that a six-day delay in formal notice makes a force majeure defense unavailable. In *Bremer Handelsgesellschaft v. Bunge Corp.*, [1983] 1 Lloyd's Rep. 476, 484 (C.A.), the seller of goods who sought to invoke force majeure conceded that his notice was defective. *Id.* at 483. Hess does not so concede and argues that its notice was adequate because it was given within a reasonable time. In *Lexmar Shipping v. Zihni Shipping Trading (The WINNA)*, S.M.A. No. 2667 at 7 (1990), the defendant gave no notice of force majeure until the demurrage bill was sent and never named an arbitrator, appeared at the arbitration hearing, or submitted papers, which the panel considered to be a concession of liability. In *Nereus Shipping v. Island Creek Coal Sales Co.*, S.M.A. No. 1763 at 13 (1982), the panel found that the delay was not due to force majeure, and therefore treated the notice issue only in dictum. The panel stated that lack of notice barred a force majeure defense where the charter party expressly made notice a condition of

invoking force majeure, unlike the contract at issue here. *Id.*

### III. *Estoppel*

Toyomenka argues that it relied upon Hess's "best efforts" notice of September 28 in deciding not to terminate the Contract under Clause QQQ. According to Toyomenka, Clause QQQ allowed it to terminate the Contract on October 18, thirty days after the force majeure event, and had it known then that Hess would take delivery late, it "would have considered exercising its termination option," because the market value of crude oil rose between the sale date, September 11, and October 18, 1989. (Norwood Aff., ¶ 20, 21; Toyomenka Rule 3(g) Statement, ¶¶ 15, 16.)

Toyomenka misreads the termination option in Clause QQQ. Neither party has a right to terminate the Contract thirty days after a force majeure event. Rather, Clause QQQ gives both parties the right to terminate the Contract upon written notice if delivery is delayed for more than thirty days. Because delivery was not delayed for more than thirty days in this case, the termination option never took effect and Toyomenka cannot have relied on Hess's assurances in deciding not to terminate.

### IV. *Applicability of Force Majeure Exception to Demurrage*

Toyomenka argues that even if the force majeure defense contained in Clause QQQ excuses Hess's delay, it does not excuse Hess from paying demurrage under the Contract. Toyomenka contends that Clause QQQ's provision that "[n]either seller nor buyer shall be liable for damages or otherwise ..." does not apply to demurrage because demurrage is not damages "or anything analogous to damages." (Toyomenka Memo. at 15.)

■ Demurrage has sometimes been described as stipulated damages for detention. *Hellenic Lines, Ltd. v. Director General of the India Supply Mission,* 319 F.Supp. 821, 831 (S.D.N.Y.1970), *aff'd,* 452 F.2d 810 (2d Cir.1971); *Intercontinental Transportation Co. v. India Supply Mission,* 261 F.Supp. 757 (S.D.N.Y.1966).

Even if demurrage is not "damages" within the meaning of the force majeure clause, it cannot reasonably be excluded from the catchall "or otherwise." The force majeure clause states that: "Neither seller nor buyer shall be liable for damages *or otherwise* for any failure or delay in performance of any obligation hereunder other than the obligation to make payment, where such failure or delay is caused by force majeure...." (Contract, Clause QQQ (emphasis added).) Clearly, demurrage did not arise from delay in making payment but rather delay in accepting delivery. Hess's delayed performance of its duty to take delivery was caused by force majeure. To require Hess to pay the resulting demurrage would make Hess "liable for damages or otherwise" resulting from that delay.

Because Hess is not liable to Toyomenka for demurrage for laytime from October 28 through November 9, 1989, it is not necessary to determine the applicable demurrage rate for that period.

### CONCLUSION

For the reasons discussed above, Hess's motion for summary judgment is granted and Toyomenka's motion for summary judgment is denied.

SO ORDERED.